Filed 5/31/24  P. v. Jones CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B328211 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA196110) |
| v. | |
| JOMAINE JONES, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Charlaine F. Olmedo, Judge.  Affirmed.

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Charles S. Lee and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 1999, when Jomaine Jones was 19 years old, he participated in a home invasion robbery during which his accomplice shot and killed one of the victims. The jury found Jones guilty of one count of first degree murder, one count of premeditated attempted murder, two counts of robbery, and five counts of attempted robbery.[1]

Jones appeals from the trial court's order denying his petition for resentencing under Penal Code former section 1170.95 (now section 1172.6)[2] after an evidentiary hearing. He contends the court erred in declining to appoint a mitigation specialist and a psychologist to assist the defense in presenting evidence that he suffered from an intellectual disability which impaired his ability to assess risk. He maintains that without such evidence, the court could not properly evaluate whether he acted with reckless indifference to human life and committed felony murder. As explained below, Jones has not demonstrated error, and we affirm.

**BACKGROUND**

I.    **Jones's Trial**

       A.    **Pertinent evidence presented at trial**

Substantial evidence presented at trial showed the following:

---

[1] Jones was tried alone. Although originally charged together, his accomplice's case was resolved separately.

[2] Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10).

Undesignated statutory references are to the Penal Code.

Between 1:00 and 2:00 a.m., on November 13, 1999, 19-year-old appellant Jones and a 23-year-old man called Earl Young forced open the door of a house in Los Angeles where nine members of the Amador extended family were present. Jones and Young each held a handgun. Two members of the Amador family, teenage brothers Jorge and Hector,[3] had been asleep in the living room. Jones approached Jorge,[4] pointed a gun at him, told him not to move, and pulled the trigger; the gun did not fire. Jones removed the magazine from the gun and reinserted it. Young then approached Jorge, pointed his own gun, and told Jorge to get on the floor. Jones knocked Jorge down. As Jorge went to the ground, he heard Young's gun make a clicking sound. Hector also got down on the ground. One of the intruders took a gold chain from Jorge's neck.

Jorge and Hector's father Abraham exited a bedroom, and Jones told him to come to the living room. Young and Jones went into various bedrooms and brought Amador family members to the living room, including Jorge and Hector's brother Carlos, their mother Maria, and Carlos's wife Marcelina.[5] Jones grabbed Marcelina by her hair as he brought her to the living room. These family members joined Jorge and Hector on the ground in the living room. Jones took Carlos's chain from his neck and Jones or Young took Carlos's wallet.

---

[3] We refer to members of the Amador family by their first names to distinguish them because they share the same surname.

[4] Jorge testified at Jones's trial.

[5] Marcelina also testified at Jones's trial.

Young told the family that he and Jones were looking for cocaine and money. According to Jorge and Marcelina, Young appeared to be the man in charge. While Jones held the family at gunpoint in the living room, Young searched and ransacked one of the bedrooms. At some point, Jones moved the sofa in front of the door, blocking the exit. When Young returned to the living room, Jones searched and ransacked another bedroom. Young moved the family to the dining room. Jones held them there while Young searched the kitchen. Jones told them to remain silent.

Young returned to the dining room, ordered Hector to stand up, and escorted Hector into the kitchen. Jones held the other family members at gunpoint in the dining room. Young asked Hector where the drugs were located, and Hector denied there were any drugs in the house. Young held Hector by the neck and struck him in the stomach. Jorge attempted to stand up and go to his brother's aid. Young called Jones into the kitchen. Jones pointed his gun at Hector while Young struck Jorge with a frying pan. Then, Young retrieved a knife from the kitchen sink and stabbed Jorge in the arm. Jones pointed his gun at Jorge and brought him back to the dining room. Maria objected to the treatment of her sons, and Jones struck her on the head with the butt of his handgun.

Young kicked down the bathroom door and escorted extended family members Justina and her two young children to the dining room. Young and Jones moved all the family members from the dining room to the living room. Young searched the bedroom Justina shared with her children's father. During the search of the house, both Young and Jones repeatedly told the

family they would kill them all if the family did not give them money.

While Young continued his search, Jones went to the dining room and grabbed a bottle of orange juice from the table. As Jones drank the juice, Jorge picked up a phone and tried to dial 911. Jorge put the phone down when Jones looked over at him. Young returned from Justina's bedroom and talked to Jones. Then Jones flicked a light in the house on and off, and a car drove by outside.

At some point, a police patrol car drove by the house. Carlos told the intruders they should leave because the police were there. Young and Jones told the family to keep quiet and not move. While Young and Jones looked out the window, Carlos moved toward the front door. Jones ordered him to stop. Carlos climbed over the sofa. Young ran toward Carlos, grabbed Carlos by the hair, and shot him in the head. Carlos died from a single gunshot wound to the head.

Young and Jones fled. They were in the Amador family home for about an hour.

On December 13, 1999, a month after the home invasion robbery and murder, detectives from the Los Angeles County Sheriff's Department interviewed Jones in Nevada, where he was incarcerated after being arrested while staying at his mother's home. Jones denied involvement in the crimes, claiming he had moved to Nevada in October 1999, the month before the crimes occurred.

A few days later, on December 16, 1999, Jones asked to speak with the same detectives again. This time, the interview was recorded, and Jones confessed his involvement in the crimes. An audio recording of the interview was played for the jury at

Jones's trial and a transcript of the interview is included in the record in Jones's direct appeal. Jones told the detectives the following.

A man called Kill-Kill told Young there were drugs and money at the Amador family home, and the resident who was involved with the drugs would be home at 2:00 a.m. Young decided to conduct a home invasion robbery, and he brought Jones in on the job. Young and Jones drove to the location with three carloads of their associates.[6] One of Kill-Kill's associates gave Jones a gun, and Young had his own gun.

Young busted through the door of the Amador family home, and knocked a man to the ground. Jones followed Young inside and closed the door. Young's gun was cocked, and Jones knew "at any moment it would go off." Jones was shaken up. As Young ransacked the house and waved his gun around, Jones told him to calm down. Jones indicated he just wanted to get the drugs and money and leave. Jones told Young, "[W]hatever you do[,] don't pull that pistol." After Jones conducted his own search and did not find anything, he told Young they should leave. He knew the area was "hot" with police.

While Jones was in the living room watching the family, he told them, "I ain't no harmful person. If you do harm to me, I'm gonna do harm to you." He told them to "[j]ust lay down," and he would not hurt them. After Young brought three additional family members to the living room, Jones reiterated that he was done and wanted to leave.

---

[6] A gang expert testified at trial that Young and Jones were members of a criminal street gang. The jury found gang enhancement allegations to be not true.

Jones described the shooting of Carlos as follows:  "Fool tried to run out the door, you know what I'm sayin['].  And he got 'em, you know what I'm sayin['].  Put him to the ground.  Put the pistol to the face and like ba ha, you know what I'm sayin['].  Popped him."  Jones was shaken up and could not believe Young had just killed a man.  Jones explained:  "I didn't think he was gonna do it.  But then again I know [Young], you know what I'm sayin['], so I know what he gonna do.  No point . . . pissing him off.  He gonna do it anyway."  Jones fled with Young.

A detective asked Jones if he had seen Young hitting or kicking members of the Amador family.  Jones responded, "[H]ey man, he was doing all that in the book."  Jones recalled that Young "cut" a boy with something in the kitchen.

Jones admitted that he took jewelry (chains) from a drawer in the home, and Young took a chain from a boy's neck.

## B.    Verdicts and sentence

The trial court instructed the jury, in pertinent part, on theories of direct aiding and abetting, natural and probable consequences, felony murder, and willful, deliberate and premeditated attempted murder.

The jury found Jones guilty of the first degree murder of Carlos, the premeditated, willful, and deliberate attempted murder of Jorge, two counts of first degree robbery (against Carlos and Jorge), and five counts of attempted robbery (against other members of the Amador family).  As to the murder and attempted murder, the jury found true the allegation that a principal personally and intentionally discharged a firearm. (§ 12022.53, subds. (c) & (d).)  As to all counts, the jury found true the allegation that Jones personally used a firearm.  (§§ 12022.5,

subd. (a)(1), 12022.53, subd. (b).)[7] The trial court sentenced Jones to 102 years to life in state prison.

Jones appealed from the judgment of his convictions, and this court affirmed the judgment. (*People v. Jones* (Apr. 30, 2003, B158567) [nonpub. opn.].)

## II.    The Petition for Resentencing

In 2018, the Legislature enacted Senate Bill No. 1437 "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Sen. Bill No. 1437 (2017-2018 Reg. Sess.) Stats. 2018, ch. 1015, § 1(f), p. 6674; §§ 188, subd. (a)(3) & 189, subd. (e).) Senate Bill No. 1437 amended sections 188 (defining malice) and 189 (felony murder) and added former section 1170.95, now renumbered section 1172.6, which established a procedure for vacating murder convictions and resentencing defendants who could no longer be convicted of murder in light of the amendments to sections 188 and 189 made effective January 1, 2019. (Stats. 2018, ch. 1015, § 4, pp. 6675–6677.)

Section 189, subdivision (e), added by Senate Bill No. 1437, states: "A participant in the perpetration or attempted

---

[7] The jury also found true a robbery-murder special circumstance under section 190.2, subdivision (a)(17). The trial court struck the finding because the verdict form erroneously failed to reflect the requisite elements that the defendant was a major participant in the robbery who acted with reckless indifference to human life.

perpetration of a felony listed in subdivision (a) [including robbery and attempted robbery] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

## A. The parties' papers

On October 20, 2020, Jones, who was represented by counsel, filed a petition for resentencing under former section 1170.95, now section 1172.6.[8] He alleged, in pertinent part, that he was entitled to relief and could not now be convicted of murder due to changes to section 188 and/or section 189, made effective January 1, 2019, because (1) he was not the actual killer; (2) he did not know the shooting would occur; (3) he was not a direct aider and abettor who acted with intent to kill; and (4) he was not a major participant in the crimes who acted with reckless indifference to human life.[9]

---

[8] In or around August 2019, more than a year before Jones filed the petition for resentencing, the trial court appointed counsel to represent Jones in connection with such a petition. Jones was represented by his appointed counsel throughout the proceedings below.

[9] The same day, October 20, 2020, Jones filed a supplemental brief, arguing former section 1170.95 should apply to attempted murder convictions, not only murder convictions. This was before the Legislature enacted Senate Bill No. 775, which amended then-section 1170.95, effective January 1, 2022,

Seven months later, on May 21, 2021, the district attorney filed a response to Jones's petition for resentencing, urging the trial court to "ultimately" deny the petition "on the ground that [Jones] is still factually and legally responsible for the murder of Carlos Amador." After setting forth a summary of the circumstances of the shooting, the district attorney argued: (1) Jones was a major participant in the home invasion robbery who acted with reckless indifference to human life, and (2) "there is enough evidence to convict [Jones] as a direct aider and abettor" of the murder. Notwithstanding these arguments, the district attorney conceded that Jones made a prima facie showing for relief in his petition.

On October 7, 2021, Jones filed a reply brief in support of his petition for resentencing, arguing that he made a prima facie showing for relief under former section 1170.95, as the district attorney conceded. He further argued the trial court should ultimately grant the petition after an evidentiary hearing because the facts show he did not act with reckless indifference to human life during the robbery.

---

to, among other things, authorize relief for persons convicted of attempted murder under the natural and probable consequences doctrine. (Sen. Bill No. 775 (2020-2021 Reg. Sess.); Stats. 2021, ch. 551, § 2.) Neither party further briefed the applicability of the statute to attempted murder convictions, and the trial court did not address the issue. Thus, the issue of whether Jones is entitled to resentencing relief on his attempted murder conviction was not decided below, and this appeal only concerns Jones's murder conviction. Jones indicated in his briefing in this appeal that he intends to file in the trial court a petition for resentencing challenging the attempted murder conviction.

## B. Jones's ex parte motions for appointment of experts

While his petition for resentencing was pending, Jones filed multiple ex parte motions for appointment of experts to assist the defense in connection with the petition.

On February 26, 2021, four months after Jones filed the petition for resentencing, he filed an ex parte motion for appointment of a mitigation specialist to assist the defense "in investigating mitigating evidence regarding [his] youth, mental disabilities, the facts and circumstances of this case, and to interview witnesses and serve subpoenas to assist defense counsel [to] prepare for presenting mitigating circumstances" in connection with the petition.  Jones further stated in the motion that the investigation would "include obtaining [his] birth records, school records, and records regarding any prior contacts with law enforcement," and also "locating and interviewing [his] parents and family members, close friends, doctors or other medical practitioners that were involved with [his] early life development, and interviewing [him] as well as obtaining prison records regarding [his] custody conduct."

In an attached declaration, defense counsel stated:  "At [Jones]'s trial[,] his counsel told the jury in opening statement that the jury would hear testimony of Dr. Adrian Davis that [Jones] had a borderline verbal IQ of 75 and an overall IQ of 77, and that his 'ability to understand and function in a situation is somewhat limited, and his overall cognitive ability is somewhat limited' [citation to trial record].  Ultimately, the court decided not to allow expert testimony on this issue on the grounds of

11

Evidence Code [section] 352 [citation to trial record]."[10]  Defense counsel represented in his declaration that the deputy district attorney on Jones's petition had no objection to the ex parte motion.  It is not clear from the appellate record before us whether the trial court ruled on this ex parte motion.

Four months later, on June 30, 2021, Jones filed another ex parte motion for appointment of a mitigation specialist.  This ex parte motion was materially similar to the earlier one referenced above, except this second motion did not mention Jones's IQ or alleged "mental disabilities."

On August 11, 2021, the trial court issued a minute order denying Jones's request for appointment of a mitigation expert.  The court concluded that defense "counsel's stated purpose for requesting a mitigation expert is irrelevant to the current status of the case and the [section 1170.95] petition currently pending before the court.  New evidence of petitioner's IQ and mitigating sentencing factors are not relevant considerations for purposes of [section] 1170.95[, subdivision] (a) and [Senate Bill No.] 1437."

On October 7, 2021, Jones filed an ex parte request for "rehearing" of the ex parte motion the trial court denied on August 11, 2021.  In this filing, Jones sought appointment of not only a mitigation specialist, as he had requested in his two prior ex parte motions, but also the appointment of a psychologist.  He argued that his youth and "issues of mental competency, low IQ, learning disabilities and childhood abuse" are relevant factors on the issue of whether he acted with reckless indifference to human

---

[10] Jones submitted no other evidence regarding his IQ, intellectual disability, or cognitive abilities in connection with his various filings in support of his request for appointment of experts (or in connection with his petition for resentencing).

life during the robbery, and specifically, his "subjective awareness of the risks involved in the robbery and conscious disregard for the risk of death his actions create[d]." (Emphasis omitted.) In his reply brief in support of the petition for resentencing, filed simultaneously with the ex parte request for rehearing, Jones again urged the court to reconsider its denial of his request for appointment of experts, arguing that his "youth, intellectual and other disabilities should be explored on the issue of reckless indifference."

On December 13, 2021, the same day as the prima facie hearing on the petition for resentencing, the trial court heard oral argument from defense counsel on Jones's request for reconsideration of the denial of the motion for appointment of experts. Defense counsel stated it would "be difficult to address [Jones's] mental intent without" expert assistance, and it would "be very tough for [the defense] to move forward without it." After setting forth on the record facts regarding the home invasion robbery and Jones's post-arrest statements to the detectives, the court concluded the assistance of a mitigation specialist and a psychologist was not warranted and denied the request for reconsideration.

## C. Prima facie hearing on petition for resentencing

At the December 13, 2021 prima facie hearing on Jones's petition for resentencing, the deputy district attorney conceded Jones made a prima facie showing for relief. The court issued an order to show cause why relief should not be granted. (Former § 1170.95, subd. (c); § 1172.6, subd. (c).) Defense counsel reiterated that in preparation for the evidentiary hearing, he "would have liked to address with a mitigation expert . . . the

13

effect of low IQ on a 19-year-old." He argued that without an expert, the defense would "never get to" the question of "what was [Jones]'s mental state of mind."

## D. Evidentiary hearing on the petition for resentencing

On January 13, 2023, the trial court held an evidentiary hearing on Jones's petition for resentencing. This was more than two years after Jones filed his petition (and more than three years after defense counsel was appointed to represent Jones in connection with the petition).

The trial court stated that it reviewed and considered, in pertinent part, the reporter's transcript of Jones's trial and the transcript of Jones's post-arrest statement to the detectives. In the present matter, we granted the Attorney General's unopposed request for judicial notice of the appellate record in Jones's direct appeal (case No. B158567), which includes the evidence the trial court reviewed and considered. Neither party introduced any "new or additional evidence," as permitted under section 1172.6, subdivision (d)(3).[11]

Based on the evidence presented at Jones's trial, the parties argued their cases to the trial court. The prosecutor argued Jones was not entitled to relief under section 1172.6 because he was guilty of murder beyond a reasonable doubt under current law. The prosecutor maintained the evidence is sufficient to establish Jones was a direct aider and abettor of the

---

[11] We note that minute orders in the record dated April 6, June 10, and July 11, 2022, state that Jones was "waiting for medical records," and the trial court continued the matter on each of those dates. Jones did not introduce any medical records in connection with his petition for resentencing.

14

murder, but the prosecution was relying on the theory that Jones was a major participant in the home invasion robbery who acted with reckless indifference to human life under the factors set forth in *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522.

Defense counsel argued Jones was entitled to relief under section 1172.6 because the prosecution could not prove beyond a reasonable doubt that he acted with reckless indifference to human life, a requisite element of felony murder where the defendant is not the actual killer or a direct aider and abettor. (See § 189, subd. (e).)  After discussing the facts and circumstances of the shooting, and asserting they do not show reckless indifference to human life, counsel argued that under prevailing case law, "the adolescent brain is definitely a factor that a court must weigh in determining whether or not a person had the subjective indication of reckless indifference."  Counsel added that the defense "would have liked to explore with expert testimony" Jones's subjective "capacity" to assess the risk of death during the robbery.  Counsel also stated, "There is evidence at trial . . . [that Jones's] IQ is in the neighborhood of 75.  These are real issues [Jones's youth and IQ] that go into the formation of judgment which I think should have been explored in the determination of reckless indifference."

The trial court stated on the record during the evidentiary hearing that it found the prosecution proved beyond a reasonable doubt (1) that Jones was a direct aider and abettor of the murder who harbored express malice, and (2) that Jones was a major participant in the home invasion robbery who acted with reckless indifference to human life.  The court discussed the evidence supporting the latter theory of murder, in light of the factors set

15

forth in *Banks* and *Clark*. Regarding Jones's subjective awareness of the risk of death, the court noted (1) that both Jones and Young were armed with and used loaded firearms during the robbery; (2) that Jones witnessed Young use "potential lethal force" on two occasions during the robbery, prior to the shooting of Carlos (hitting a victim over the head with a frying pan and stabbing him with a knife), and Jones continued to participate in the robbery thereafter; and (3) that Jones told the detectives that Young had a temper and was likely to use force on someone. The court denied the petition for resentencing. In doing so, the court stated on the record that while it "recognize[d]" Jones's youth and IQ, it found the evidence established Jones acted with reckless indifference to human life.

## DISCUSSION

Jones contends the trial court abused its discretion in declining to appoint a mitigation specialist and a psychologist to assist the defense in presenting evidence of his alleged intellectual disability at the evidentiary hearing. He argues that without such evidence, the court could not "fairly evaluate" whether he acted with reckless indifference to human life and committed felony murder.

**I.      Section 1172.6 and Standards Applicable to the Evidentiary Hearing**

If a defendant files a facially sufficient petition for resentencing and makes a prima facie case for relief under section 1172.6, as in this case, the trial court must issue an order to show cause and "hold a hearing to determine whether to vacate the murder . . . conviction and to recall the sentence and resentence the petitioner on any remaining counts . . . ." (§ 1172.6, subd. (d)(1).) At the hearing, the burden of proof is "on

16

the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) The parties may rely on "evidence previously admitted at any prior hearing or trial that is admissible under current law," and they "may also offer new or additional evidence to meet their respective burdens." (*Ibid*.) "At the evidentiary hearing, the trial court acts as an independent fact finder." (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.) "We review the trial court's factual findings for substantial evidence." (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 125.)

## II.   Standard of Review of Denial of Appointment of Expert

Jones moved for appointment of experts under Evidence Code section 730, which provides, in pertinent part: "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required. . . ." We review the denial of a request for appointment of an expert under Evidence Code section 730 for abuse of discretion. (See *Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 321; *People v. Stuckey* (2009) 175 Cal.App.4th 898, 904, 907-908, 917.)

While Evidence Code section 730, by its terms, applies to appointment of experts at *trial*, we agree with the parties that

17

the same standard of review applies here where the trial court denied the appointment of experts in connection with an evidentiary hearing under section 1172.6.  We also agree with the parties that any error is subject to harmless error review under the test set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 for state law error: whether it is reasonably probable that the defendant would have achieved a more favorable result in the absence of the error.  (See *People v. Vance* (2023) 94 Cal.App.5th 706, 714 [evidentiary error at an evidentiary hearing under section 1172.6 is reviewed under the *Watson* harmless error analysis].)

Under sections 28 and 29, in the guilt phase of a criminal action, an expert may testify about a defendant's " 'mental condition at the time of offense' " but may not testify about the defendant's " 'capacity to have, or actually having, the intent required to commit the charged crime.' "  (*People v. Pearson* (2013) 56 Cal.4th 393, 451; *People v. Bloom* (2022) 12 Cal.5th 1008, 1052.)

## III.  Reckless Indifference to Human Life for Felony Murder – General Legal Principles

"Reckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' "  (*In re Scoggins* (2020) 9 Cal.5th 667, 676 (*Scoggins*).)  It "has a subjective and an objective element.  [Citation.]  As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.'  [Citations.]  As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that,

considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' [Citation.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement. [Citation.] Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life." (*Id.* at pp. 677-678.)

In *Clark*, the Supreme Court established a list of factors useful to determining whether a defendant acted with reckless indifference to human life while engaged in the commission or attempted commission of a felony: (1) The defendant's knowledge of weapons, the number of weapons used, and the defendant's own use of weapons; (2) the defendant's physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) the duration of the felony; (4) the defendant's knowledge that his cohort was likely to kill; and (5) whether the defendant made efforts to minimize the risk of violence during the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618-622.) The Supreme Court clarified that these considerations are not exhaustive, sufficient, nor necessary to establishing whether the defendant's conduct meets the standard for reckless indifference to human life. (*Id.* at p. 618.) Knowledge that a confederate has a gun and that armed robberies carry a risk of death, without more, is not sufficient to show reckless indifference to human life. (*Id.* at pp. 617-618.) However, a "defendant's willingness to

19

engage in an armed robbery with individuals known to him to use lethal force may give rise to the inference that the defendant disregarded a 'grave risk of death.' " (*Id*. at p. 621.)

## IV.  Jones Has Not Established Error

In this appeal, Jones explains that he does not challenge the sufficiency of the evidence supporting the trial court's findings that he was a major participant in the home invasion robbery who acted with reckless indifference to human life. Thus, he concedes there is substantial evidence supporting both the subjective and objective components of the reckless indifference to human life element.

What Jones challenges here is a purported "unfairness" in the way the trial court adjudicated the factual issue of reckless indifference to human life.  He asserts, "No trier of fact could fairly evaluate reckless indifference without hearing the evidence that the petition court excluded."  He describes the excluded evidence as follows:  "Intellectual disability is similar to youth in that it manifests in an adult's failure to function at the normal age level and 'meet age-related expectations,' functioning like a child despite chronological age.  (DSM-5 [Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013)].)  The psychologist that counsel sought to have appointed in this case could have testified to the conclusions in the DSM-5 as it relates to the effect of intellectual disability on risk assessment in younger defendants."

Although Jones references the DSM-5 as the basis for the proposed expert testimony, he does not set forth the DSM-5's criteria for intellectual disability.  In the DSM-5, the American Psychiatric Association (APA) replaced the diagnosis of "mental retardation" with "intellectual disability."  Intellectual disability

20

is characterized by significant deficits (two standard deviations below the mean) in cognitive/intellectual functioning (e.g., learning, problem solving, and judgment) and adaptive functioning (e.g., communication skills and social participation) that typically manifest before the age of 18.  A diagnosis of intellectual disability does not require a specific overall IQ score, but IQ testing is used to diagnose the condition.  An overall IQ of 70 or less has traditionally accompanied a diagnosis of intellectual disability under the DSM; significant defects in adaptive functioning also must be present.  (APA, *Intellectual Disability* <https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/DSM/APA_DSM-5-Intellectual-Disability.pdf> [as of May 31, 2024], archived at <https://perma.cc/5XK6-8SFA>; APA, *What Is Intellectual Disability* <https://www.psychiatry.org/patients-families/intellectual-disability/what-is-intellectual-disability> [as of May 31, 2024, archived at <https://perma.cc/6TTR-NNJ3>].)

In the context of criminal competency proceedings, the Penal Code defines intellectual disability as "the condition of significantly subaverage general intellectual functioning existing concurrently with defects in adaptive behavior and manifested before the end of the development period, as defined by clinical standards."  (§ 1376, subd. (a)(1).)  Our Supreme Court has recognized that an overall " 'IQ between 70 and 75 or lower' " is " 'typically considered the cutoff IQ' " for establishing the intellectual functioning prong of an intellectual disability diagnosis.  (*In re Hawthorne* (2005) 35 Cal.4th 40, 48, quoting *Atkins v. Virginia* (2002) 536 U.S. 304, 309, fn. 5.)  Neither our legislature nor our Supreme Court, however, has adopted a "fixed cutoff" IQ score as an "upper limit" for showing significantly

21

subaverage general intellectual functioning within the meaning of section 1376. (*Hawthorne*, at p. 48; see also *In re Lewis* (2018) 4 Cal.5th 1185, 1191.)

On the record before us, we cannot conclude the trial court abused its discretion in declining to appoint expert witnesses to assist the defense. Jones failed to make a showing below that the assistance of experts was required (or even warranted or relevant) in this case.

Defense counsel's offer of proof in support of his request for expert assistance was as follows: "At [Jones]'s trial[,] his counsel told the jury in opening statement that the jury would hear testimony of Dr. Adrian Davis that [Jones] had a borderline verbal IQ of 75 and an overall IQ of 77, and that his 'ability to understand and function in a situation is *somewhat* limited, and his overall cognitive ability is *somewhat* limited' [citation to trial record]." (Italics added.) The offer of proof does not indicate Jones has an "intellectual disability" within the meaning of the DSM-5 (or California law). The alleged IQ scores do not necessarily indicate a significant deficit in cognitive/intellectual functioning, and there was no suggestion of a significant deficit in adaptive functioning.

A 2002 pretrial probation report in the record before us states that Jones completed the 11th grade and began taking 12th grade classes before dropping out of school. Statements from Jones and his mother regarding Jones's history were incorporated into this probation report. Nothing in the statements suggested Jones had an intellectual disability. The probation report indicates Jones *did not* have any mental or emotional problems.

Jones argues an abuse of discretion is shown here because in ruling on the request for appointment of experts the trial court (1) cited inapposite cases and (2) "prejudg[ed]" the merits of the case by "essentially decid[ing] the reckless indifference issue as a foundation for denying the prehearing motions for defense assistance." As to the first point, Jones acknowledges there are no "California cases discussing intellectual disability relative to the subjective awareness which is a component of reckless indifference" to human life. The trial court cited cases regarding consideration of a defendant's youth, the other issue on which Jones sought to present expert testimony, as stated in his ex parte applications. Jones, himself, relies in his opening brief on one of the two cases the trial court cited—*In re Moore* (2021) 68 Cal.App.5th 434—in support of his argument that "a defendant's chronological age is pertinent to the issue of whether that defendant was aware of the risk and danger involved." (*Id.* at p. 439 [holding, "a defendant's youth at the time of the offense should be a factor in determining whether that defendant acted with reckless indifference to human life under section 190.2, subdivision (d)" concerning special circumstance murder].)

As to Jones's second point, we disagree with his position that the trial court abused its discretion by considering the facts of the case (i.e., evidence in the trial record of Jones's conduct during the home invasion robbery and his post-arrest statements to the detectives) in deciding whether appointment of experts was required here. Given the dearth of information in Jones's offer of proof regarding a potential intellectual disability, evidence of his conduct and statements informed the issue of whether expert testimony was necessary.

23

## V. Jones Has Not Shown Prejudice

Even assuming Jones could show an abuse of discretion, we would not reverse the order denying the petition for resentencing because he has not demonstrated prejudice. It is not reasonably probable he would have achieved a more favorable result if the trial court had heard expert testimony regarding "the effect of intellectual disability on risk assessment in younger defendants."

Jones concedes his "defense that he did not anticipate Young's homicidal act could still be presented without expert testimony concerning the effect of intellectual disability." He also acknowledges that lay witness testimony about a defendant's characteristics, such as "being 'slow' or an easily-led follower" is admissible. Yet Jones presented no evidence at the evidentiary hearing regarding any cognitive or adaptive functioning deficits. Defense counsel never stated below that he could *not* access Jones's school records or obtain statements from family members or friends without expert assistance. Moreover, despite the lack of evidence at the hearing of an intellectual disability, the trial court stated on the record that it considered Jones's youth and IQ in deciding if the evidence proved he acted with reckless indifference to human life.

The trial court concluded Jones's conduct during the home invasion robbery and his post-arrest statements to the detectives about the robbery demonstrate he acted with reckless indifference to human life. Jones does not challenge the sufficiency of the evidence supporting the court's findings. Reviewing the evidence in a light most favorable to the court's decision, as we must, there is strong evidence that Jones was " 'aware of and willingly involved in the violent manner in which the particular offense [was] committed,' and he . . . consciously

24

disregard[ed] 'the significant risk of death his . . . actions create[d],' " such that any error here was harmless. (See *Scoggins*, *supra*, 9 Cal.5th at p. 677.)

Substantial evidence presented at trial shows Jones engaged in violent conduct during the hour-long home invasion robbery. He pointed his gun at members of the Amador family and held them against their will. He pulled Marcelina by her hair as he led her from her bedroom to the living room. He struck Maria with the butt of his gun when she protested Young's violent assaults on her sons. He told the family he and Young would kill them if the family did not turn over drugs and money.

Substantial evidence also demonstrates that Jones consciously disregarded the significant risk of death. His statements to the detectives show he was concerned Young would fire his gun as he watched Young wave the gun around. He understood that if something went wrong, Young would act. And yet he continued to participate in the robbery and the violence. He attempted to block the victims' exit by moving a couch in front of the door. When Young struck Jorge with a frying pan and stabbed him in the arm, Jones pointed a gun at Jorge and brought him back to the dining room. As Jones indicated to the officers, he knew Young, and he knew what Young would do if someone made him angry by doing something foolish.

Any error in declining to appoint experts was harmless in light of the overwhelming evidence supporting both the subjective and objective elements of reckless indifference to human life.[12]

---

[12] Because we have no cause to disturb the trial court's findings that Jones was a major participant in the home invasion robbery who acted with reckless indifference to human life, we need not review Jones's challenge to the sufficiency of the

## DISPOSITION

The trial court's order denying the petition for resentencing is affirmed.

NOT TO BE PUBLISHED


CHANEY, J.


We concur:



BENDIX, Acting P. J.



WEINGART, J.

---

evidence supporting the trial court's alternate ground for denying the petition—that Jones was a direct aider and abettor of the murder who harbored express malice.